UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION


JERRY ALEXANDER MENCHU,

        Plaintiff,

    v.

LEGACY HEALTH, *et al*,

        Defendants.

No. 3:12-cv-02075-ST

FINDINGS AND
RECOMMENDATIONS


STEWART, Magistrate Judge:

## **INTRODUCTION**

Plaintiff, Jerry Menchu ("Menchu"), who identifies himself as a "person of Hispanic culture," grew up and obtained his education in Guatemala, has black hair, brown eyes, Mediterranean features, and a Spanish accent. Complaint, ¶¶ 1, 6. Menchu filed this case *pro se* on November 15, 2012, alleging claims for race discrimination under both federal and state law, and for intentional and negligent infliction of emotional distress against Legacy Health[1] ("Legacy"), two of its security officers (Rodney Hutton ("Hutton") and Bernardo Montoya

---

[1] Legacy Health is incorrectly named as "Legacy Health System" in the Complaint. Answer (docket #18), p. 1 & ¶ 7. At oral argument, the parties agreed that the caption should be corrected by interlineation.

("Montoya")), two of its security managers (Christopher Silva ("Silva") and Luke Heckathorn

("Heckathorn")), and one of its physical therapists (Kila Mitchell ("Mitchell")).[2]

For many years, Menchu performed interpreting services for LEP (limited English

proficiency) patients in the Portland metropolitan area and regularly came onto Legacy's hospital

campuses to perform those services.  *Id*, ¶ 6.  On January 24, 2011, while in the cafeteria located

in the Legacy Good Samaritan Medical Center, he was approached by Hutton and Montoya and

told not to come back to the hospital or he would be arrested.  *Id*, ¶¶15-17.  Menchu was "in a

state of shock and also embarrassed" by this announcement.  *Id*, ¶ 17.  When he asked why,

Hutton told him it was because he was bothering an employee.  *Id*, ¶ 18.  Menchu then asked

whom he could contact to get more information, and Hutton provided Silva's phone number.  *Id*.

Thirty minutes later, Menchu called Silva who repeatedly told Menchu that he would be arrested

if he stepped on Legacy's property.  *Id*, ¶ 19.  Menchu retained an attorney who was advised by

Legacy's attorney that Menchu could not enter Legacy premises.  *Id*, ¶ 23.

Although his allegations date back only to January 24, 2011, as discussed below, the

events leading up to this lawsuit actually begin about five years earlier with complaints by

Mitchell about Menchu's conduct which caused Legacy to ask Menchu's employer not to send

Menchu to perform interpretative services in Mitchell's department and eventually resulted in a

decision to bar Menchu from Legacy premises.

Menchu filed a complaint against Legacy with the United States Department of Health

and Human Services ("HHS") Office of Civil Rights ("OCR"), alleging race and gender

discrimination which the OCR later found unsubstantiated.  Love-Geiger Decl., Ex. 1, pp. 26-30

---

[2] Although not listed in the caption, the pleadings identify a "Jane Doe" conspirator, "possibly known as 'Kila Mitchell.'" Complaint, ¶ 12.

(Menchu Depo. Ex. 21). He also filed a similar complaint with the Oregon Bureau of Labor and Industries ("BOLI") which was ultimately dismissed. *Id*, p. 25.

This court has jurisdiction over Menchu's federal race discrimination claims under 28 USC § 1331 and supplemental jurisdiction over Menchu's state law claims under 28 USC § 1367.

Defendants have filed a Motion for Summary Judgment and for Sanctions (docket #124), and Menchu has filed a Cross-Motion for Summary Judgment (docket #139). As discussed detail below, not a shred of evidence, save for Menchu's unfounded speculations, supports the notion that Legacy barred Menchu from its premises for discriminatory reasons. His common law tort claims fare no better. Accordingly, defendants should be granted summary judgment against all claims and denied sanctions, and a judgment should be entered in favor of defendants against all of Menchu's claims.

## UNDISPUTED FACTS

In support of their motion, defendants submitted 11 pages of background and procedural facts, well supported by declarations and deposition excerpts. Defendants' Memorandum of Law in Support of Defendants' Motion for Summary Judgment and for Sanctions (docket #125), pp. 2-12 (Sections II and III). On January 31, 2014, this court explicitly advised Menchu that, as required by FRCP 56:

> **As part of your opposition to defendants' motion for summary judgment, you must include a response to the factual contentions in Sections II and III.** You must respond to each factual assertion of Sections II and III by: (1) accepting or denying each fact contained therein; or (2) articulating opposition to defendants' contention or interpretation of the fact, based on the supporting affidavits. **You are advised that material facts set forth in Sections II and III will be deemed admitted unless specifically denied, or otherwise controverted by you.**

3 – FINDINGS AND RECOMMENDATIONS

Summary Judgment Advice Notice and Notice to Plaintiff That Uncontroverted Facts Will be Deemed Admitted (docket #135), p. 2.

In response, Menchu filed his cross-motion, attaching 81 exhibits totaling over 1,100 pages (docket #139), a supporting memorandum of law (docket #140), and a "Statement of Uncontroverted Facts and Conclusions of Law" (docket #141). These documents accuse virtually every Legacy employee involved in this case of lying, fabricating emails, and conspiring to have Menchu "trespassed from" Legacy's properties. Nothing supports these accusations, and Menchu has offered nothing substantive to counter the factual information presented by defendants. Accordingly, this court incorporates Sections II and II of defendants' memorandum as if fully set forth herein. The remainder of this Findings and Recommendations will discuss the few evidentiary issues raised by Menchu and why they do not preserve his claims.

## FINDINGS

### I. Statutory Discrimination Claims

Menchu alleges five claims for race discrimination under: (1) 42 USC § 2000a(a) (First Claim); (2) 42 USC § 2000d (Second Claim); (3) 42 USC § 1981 (Third Claim); (4) 42 USC § 1985 (Fourth Claim); and (5) ORS 659A.403 (Fifth Claim). Based on the undisputed facts, defendants are entitled to summary judgment against each of these claims.

#### A. First and Fifth Claims – Place of Public Accommodation

Under 42 USC § 2000a(a), all persons are guaranteed "the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of any place of public accommodation." The state law counterpart, ORS 659A.403, entitles all persons "the full and equal accommodations, advantages, facilities and privileges of any place of public

accommodation, without any distinction, discrimination or restriction on account of race, color, religion, sex, sexual orientation, national origin, marital status or age if the individual is 18 years of age or older."

These claims fail against all the individual defendants because they are not capable of being "place[s] of public accommodation."  Menchu has submitted nothing to establish that Legacy is a place of "public accommodation," but presumably relies on the medical services offered at Legacy Good Samaritan Hospital and the dining services offered in its cafeteria[3] to fit Legacy within the confines of that definition.  *See Dombrowski v. Dowling*, 459 F2d 190, 197-98 (7th Cir 1972) ("it has been held that a public cafeteria in a hospital makes the hospital itself a public accommodation") (citation omitted); *Roberts v. Legacy Meridian Park Hosp.*, No. 3:13-CV-01136- SI, 2014 WL 294549, at *5 (D Or Jan. 24, 2014) ("Meridian Park provides medical services to the public and is therefore a public accommodation within the definition stated in [ORS] 659A.400(a)(1).").  Assuming Menchu clears that hurdle, these claims nevertheless fail for lack of evidence of discrimination, as discussed below.

### B.  <u>Second Claim – Entity Receiving Federal Financial Assistance</u>

Under 42 USC § 2000d:

> No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

A claim under this statute requires proof:  "(1) that there is racial or national origin discrimination and (2) the entity engaging in the discrimination is receiving federal financial assistance."  *Baker v. Board of Regents of State of Kan.*, 991 F2d 628, 631 (10th Cir 1993) (citation omitted).  Once again, the individual defendants cannot be held liable under this statute

---

[3] Paragraph 15 of the Complaint refers to Menchu "enjoying the services of the Lovejoy Station Café, inside of Legacy Good Samaritan Medical Center."

because they are not entities "receiving Federal financial assistance." *Atkins v. The Bremerton Sch. Dist.*, No. CO4-5779RBL, 2005 WL 1356261, at *2 (WD Wash June 7, 2005) ("Liability for such intentional discrimination [under § 2000d] is against the entity only."). It is unsettled whether Menchu must establish that he was the intended beneficiary of the federally funded program. *See Epileptic Found. v. City & Cnty. of Maui*, 300 F Supp2d 1003, 1011 (D Haw 2003) (noting that Ninth Circuit cited a case requiring such proof). To the degree he must present such proof, however, he has failed to do so. Finally, and more fundamentally, and as discussed below, Menchu's proof fails for lack of proof of discriminatory intent.

### C.  Third Claim – Discrimination in the Making and Enforcing of Contracts

Menchu next alleges a claim under 42 USC § 1981 which "prohibits racial discrimination in the making and enforcement of contracts." *Runyon v. McCrary*, 427 US 160, 169 (1976). The 1991 amendment clarified that it encompasses "all phases and incidents of the contractual relationship." *Rivers v. Roadway Express, Inc.*, 511 US 298, 302 (1994). To prevail on a contract-based § 1981 claim, a plaintiff must prove that: (1) he is a member of a racial minority; (2) the defendant establishment intentionally discriminated against him because of his race; and (3) the discrimination involved the making or enforcement of a contract. *Allen v. U.S. Bancorp*, 264 F Supp2d 945, 948 (D Or 2003). Thus, when minority patrons are offered "different 'terms and conditions of the contractual relationship,'" a business violates § 1981. *Id* at 949.

Based on the allegations in the Complaint, the § 1981 claim arises from Legacy's acceptance of credit cards in payment for food, beverage, and other services. In particular, paragraph 48 alleges that the "swipe of [Menchu's] credit card at Legacy constitutes a contract between [him] and his credit card company, Visa," and paragraph 50 alleges that Legacy "refused to contract on equal terms with [him] on the basis his race and national origin." A

§ 1981 violation may be based on "the denial of various services in restaurants and stores." *Allen*, 264 F Supp2d at 949 (citing cases). It may also be based on "race-based contract modifications," such as "requiring plaintiff to remove his sunglasses as a *new* condition of doing business at the bank." *Id*. Thus, Menchu could premise a § 1981 violation on Legacy denying him access to its cafeteria based on his race or even requiring him to pay cash instead of using his credit card based on his race. However, such violations would be based on Menchu's contract with Legacy as a customer or patient to use his credit card, which he does not allege, and not on Menchu's contract with his credit card company as he does allege. Moreover, Menchu has submitted no evidence that Legacy in any way interfered with his contract with his credit card company. Thus, to the extent the § 1981 claim is based on Menchu's inability to use his credit card at Legacy's cafeteria, summary judgment should be granted to defendants.

The record is far from clear as to whether Menchu had any other contractual relationship with Legacy that allegedly could have been impaired for purposes of a § 1981 claim. He asserts that Telelanguage ended its agreement with him in 2008 that he learned later was due to discrimination by Legacy. However, he offers no evidence to support that assertion. After leaving Telelanguage, he co-founded a business, Manger Bilingual Communications, LLC, an assumed business name for a Guatemalan company, for which he was the U.S. representative. Menchu Ex. 70. Again, Menchu has submitted no evidence regarding any interference by Legacy with this contract. Moreover, in response to Legacy's discovery requests, Menchu refused to provide information as to whether this business was registered and capable of entering into contracts, citing a "business privilege." Menchu Depo., pp. 73-75, 91-92. Thus, to the extent his § 1981 claim is based on Menchu's contract with a third party, defendants are entitled to summary judgment against the § 1981 claim.

### D. <u>Fourth Claim – Conspiracy to Deprive of Equal Protection</u>

To survive summary judgment against his claim under 42 USC § 1985(3), Menchu must show "the existence of a conspiracy to deprive [him] of the equal protection of the laws; an act in furtherance of the conspiracy; and a resulting injury." *Addisu v. Fred Meyer, Inc.*, 198 F3d 1130, 1141 (9th Cir 2000) (internal numbering and citation omitted). To prove a claim for conspiracy under § 1985(3), Menchu must show "(1) that 'some racial, or perhaps otherwise, class-based, invidiously discriminatory animus [lay] behind the conspirators' action,' . . . and (2) that the conspiracy 'aimed at interfering with rights' that are 'protected against private, as well as official, encroachment.'" *Butler v. Elle*, 281 F3d 1014, 1028 (9th Cir 2002), citing *Bray v. Alexandria Women's Health Clinic*, 506 US 263, 267-68 (1993). Menchu's proof fails on all of these elements. He has not identified any conspiracy, other than to name and cast aspersions against the various Legacy employees who responded to Mitchell's complaints and, following their investigation, made the decision to bar him from Legacy premises and carry out that decision. And, again, as discussed below, he has presented not a shred of evidence that invidious discrimination infected defendants' decision.

### E. <u>Discriminatory Intent</u>

Each of Menchu's five discrimination claims requires proof of intentional discrimination. *See Akiyama v. U.S. Judo Inc.*, 181 F Supp2d 1179, 1187 (WD Wa 2001) (Title II of the Civil Rights Act of 1964, 42 USC § 2000a(a), requires "some evidence that the [allegedly adverse action] was aimed at a particular religious belief and/or that the proprietor adopted the regulation as a pretext for intentional discrimination . . . ."); *Yoakum v. Wells Fargo Bank Nat'l Ass'n*, Civil No. 09-1114-JE, 2011 WL 1541285, at *7 (D Or Mar. 30, 2011), *Findings and Recommendation adopted*, 2011 WL 1242542 (D Or Apr. 21, 2011) (analyzing claim for violation of

ORS 659A.403 under burden-shifting approach of Title VII claims); *United Steel Workers Local 12-369 v. United Steel Workers Int'l*, 728 F3d 1107, 1118 (9th Cir 2013) ("The same legal principles that apply to a Title VII claim apply to a claim of race discrimination under 42 USC § 1981."); *The Comm. Concerning Cmty. Improvement v. City of Modesto*, 583 F3d 690, 702-03 (9th Cir 2009) (citation omitted) ("§ 1983 claims alleging violations of equal protection and Title VII [42 USC § 2000d] require similar proofs – [including that] defendants acted with an intent or purpose to discriminate based upon plaintiffs' membership in a protected class."); *Gay v. Waiters' & Dairy Lunchmen's Union, Local No. 30*, 694 F2d 531, 537 (9th Cir 1982) (42 USC § 1981 requires proof of intentional discrimination); *Evans v. McKay*, 869 F2d 1341, 1345 (9th Cir 1989) ("As with section 1981, sections 1985(2) and (3) require a plaintiff to plead racial animus.").

Menchu's response to defendants' motion basically follows three tracks. First, he denies that any of his conduct toward Mitchell constituted "stalking" or "harassment," detailing the professional – or at least innocent – nature of their conversations and encounters. Second, he offers his interpretation of an email authored by Silva as providing "direct" evidence of discrimination. And, finally, the bulk of his assertions attacks the veracity of defendants' witnesses and documents. None of these three lines of offense provide Menchu with the evidence he needs to avoid summary judgment for defendants against his claims.

Menchu characterizes the nature of his conversations and contacts with Mitchell as innocent efforts to work with or befriend her. In particular, he describes his conversations with her as nothing more than friendly banter between two people who began as work acquaintances and became friends, claims that he left his business card on Mitchell's car for the legitimate business reason of providing her with his updated contact information in the event she needed

interpretive services for her patients, and denies ever "stalking" Mitchell (indeed he turns the tables and asserts that Mitchell was "stalking" him).  Instead, he asserts that his brief encounters with Mitchell on or around the Legacy premises were simply coincidental, in part due to their respective work on the Legacy Good Samaritan Hospital campus and in part due to the proximity of his office.  Additionally, Menchu questions whether Mitchell really felt harassed or threatened by his conduct or comments.  He points out that, in multiple forms ordering interpretive services, Mitchell did not say anything in the "Comments" section indicating that she found anything untoward about his behavior and that she "never reached out and said anything" to her coworkers at the time.

This court will assume for the sake of argument that Menchu harbored nothing more than a desire to befriend or promote his professional relationship with Mitchell.  However, his intentions are irrelevant to his discrimination claims.  Each of Menchu's five discrimination claims against Legacy and its various employees, as discussed above, require a showing that the decision to eject him from Legacy properties was driven by discriminatory animus due to his race.  Menchu waxes vehement on the discrepancies between Legacy's treatment of Mitchell (white) and himself (Spanish-speaking with an accent and dark complexion), in particular, defendants' failure to interview him to learn of his innocence.  However, an exhaustive review of the record reveals nothing to support his assertions that based on his race defendants discussed, much less decided, to stop having have him perform interpreting services in Mitchell's department and later to bar him from Legacy property altogether.

Defendants' investigation and decisions regarding Menchu focused exclusively on his conduct directed against Mitchell, a Legacy employee, on and around Legacy property.  In 2006, Mitchell found Menchu's communications to be inappropriate and overly personal.  Mitchell

Decl., ¶ 2.  She asked him to stop.  *Id.*  In early June 2007, Mitchell complained to defendants that Menchu had made "unwanted comments" to her, that she found him "standing in the stairwell when she entered as if he was waiting for her" on three occasions, and that he made her feel "very uneasy" to the point that she purchased mace.  Mitchell Decl., ¶ 3; Marquis Decl., ¶ 3 & Ex. 2, p. 1; Ex. 3, pp. 3, 5.  Ruth Marquis ("Marquis"), Legacy's Employee Relations Consultant, noted that Legacy's past practice was to contact its contractor and report inappropriate behavior by their staff and request that it stop.  Marquis Decl., Ex. 2, p. 1.  Another Legacy employee contacted the company Menchu worked through (Telelanguage) and requested that Menchu no longer be given assignments in Mitchell's department and be asked not to attempt to contact Mitchell.  *Id*, ¶ 5 & Ex. 3, p. 2.

In August and September 2007, one of Mitchell's coworkers reported that Menchu had repeatedly approached her, both on and off of Legacy property, and asked to talk to Mitchell.  *Id*, ¶¶ 6-7 & Ex. 3, pp. 1-2.  Following those encounters, Mitchell apparently attempted to avoid any further interactions with Menchu by altering her own conduct, no longer using elevators, changing her parking location, changing the route she took to her car and racing to her car if she spotted Menchu.  Mitchell Decl., ¶¶ 7-9.  However, Mitchell's efforts to deal with Menchu's perceived harassment on her own came to a stop in early January 2011 when he first waited at her car and then, the following day, left his business card on her car.  *Id*, ¶ 10.  Mitchell then initiated a formal complaint proceeding, contacting Hutton who, in turn, reported Mitchell's complaint to Silva.  *Id*, ¶ 11; Hutton Decl., ¶¶ 2-4 & Ex. 1.

On January 21, 2011, Mitchell attended a meeting with Tanya Rogers (apparently Mitchell's supervisor), Gail Weisgerber (Manager of Outpatient Rehabilitation, the department in which Mitchell worked), Hutton, Silva, and Marquis.  Mitchell Decl., ¶ 12.  During that

meeting, Mitchell recounted the history of her interactions with Menchu, all of which made her feel uncomfortable and afraid for her safety. *Id*. The subject of Menchu's race or national origin was not discussed at all. *Id*; Hutton Decl., ¶ 5; Marquis Decl., ¶ 9; Silva Decl., ¶ 4; Weisgerber Decl., ¶ 6. Silva recommended that Menchu be "trespassed from" Legacy premises in order to protect Mitchell from his unwelcome conduct. Silva Decl., ¶ 4. Everyone at the meeting agreed, even though it appears that Marquis was ultimately responsible for the decision. Marquis Decl., ¶ 9. When Mitchell notified Hutton on January 24, 2011, that she had spotted Menchu in Legacy's cafeteria area at a computer, he and Montoya told Menchu that he "was being trespassed from Legacy facilities" and issued him an oral Criminal Trespass Warning. Hutton Decl., ¶ 6 & Ex. 2.

As "direct" evidence of discrimination, Menchu points to Silva's January 26, 2011 email to other Legacy employees describing part of his telephone conversation with Menchu as follows: "When asked what his business at Legacy [Good Samaritan Hospital] was, Jerry stated that he 'helps' Spanish speaking people into the building and gives them his card." Menchu Ex. 77. Menchu is mistaken that this constitutes evidence of discrimination, direct or circumstantial. While "Spanish speaking people" are mentioned by Silva, it is only in the context of Silva quoting Menchu's description of the business he had on Legacy's premises and is a simply part of Silva's recitation of the history of the events leading up to his conversation with Menchu. Apart from its content, which is wholly lacking in evidence of discriminatory intentions, it is difficult to discern how this email, dated five days after the decision to order Menchu not to trespass, can be construed to evidence discriminatory intent in making the trespass decision.

Menchu also points to the Silva's description of Menchu as "a Hispanic Male Adult, between 40 and 45 years of age." Hutton Decl., Ex. 1, p. 3. However, that reference was obviously intended to provide a physical description of Menchu to assist in identifying him and cannot remotely be construed as evidence of any discriminatory intent.[4]

At the hearing on the motions, Menchu mentioned several other exhibits as additional evidence of discriminatory intent, but none of them is helpful. Exhibit 28 is a story in the Oregonian newspaper about Silva finding and returning a lost wallet to a white family. Just because a white family lost a wallet which Silva returned does not prove that Silva discriminates based on race. Menchu further noted that Exhibit 45, pages 15-16, is a Security Report regarding an Asian person. However, the record does not reveal that Legacy had a practice or policy of selectively issuing Security Reports to minorities. Menchu also pointed to Exhibit 50, a form Vendor Agreement that contains a provision allowing Legacy's vendors on its premises for business purposes. Although Menchu claims that this policy is aimed at interpreters who are predominantly minorities such as himself, the Vendor Agreement applies to all of Legacy's various types of vendors. Furthermore, the provision at issue is a standard non-solicitation provision. Absent any evidence of an adverse impact on minority vendors, the Vendor Agreement proves nothing.[5]

Giving him the benefit of all inferences in his favor, Menchu has failed to make out even a *prima facie* case that defendants' actions of barring him from performing interpretive services in Mitchell's department and later ejecting him from Legacy's property, were driven by unlawful, race-based discriminatory motives. Even were Menchu's evidence somehow

---

[4] Even if these statements could somehow be so construed, they were made by Silva and Hutton, not by Marquis, who appears to be the person at Legacy who ultimately had responsibility for deciding how to handle the complaints by Mitchell. *See* Marquis Decl., ¶¶ 5, 9 & Ex. 3, pp. 2-3.
[5] According to defendants, the Vendor Agreement is the subject of Menchu's new BOLI complaint which he refused to discuss in his deposition.

13 – FINDINGS AND RECOMMENDATIONS

construed to show discriminatory intent by any of the defendants, however, his discrimination claims nonetheless fail.

Defendants have unquestionably provided a legitimate, nondiscriminatory reason for the adverse actions taken against Menchu, namely to protect a Legacy employee from what she perceived to be conduct bordering on the menacing.  In the face of this proof, Menchu must come forward with specific, substantial evidence of pretext in order to avoid summary judgment. He has wholly failed to do so.

As noted above, the bulk of Menchu's argument is an attack on the veracity of defendants' witnesses and legitimacy of the documents they have submitted.  Menchu accuses defendants of lying and fabricating emails in the course of conspiring to have him barred from Legacy properties.  Nothing supports these accusations other than Menchu's speculation. Beyond those speculations, Menchu also accuses defendants of violating his right to be in a "public forum" when he placed his business card on Mitchell's car because it was parked on the street and not in a Legacy lot.  He also claims that by taking the business card that he left on Mitchell's car, defendants performed an illegal search.  Finally, he devotes many pages to questioning the timing of Legacy's revision of its Visitor Behavior Management Policies, appearing to argue that one of the amendments was in response to his appeal of the BOLI dismissal.  None of these arguments has any merit.

Although "a plaintiff's burden to raise a triable issue of pretext 'is hardly an onerous one,'[6] Menchu has failed to meet his burden.  Accordingly, defendants are entitled to summary judgment against each of Menchu's five discrimination claims.

///

///

---

[6] *Noyes v. Kelly Servs.*, 488 F3d 1163, 1170 (9th Cir 2007), quoting *Payne v. Norwest Corp.*, 113 F3d 1079, 1080 (9th Cir 1997).

## II. **State Tort Claims**

This leaves only Menchu's two tort claims for Intentional Infliction of Emotional Distress ("IIED") (Sixth Claim) and Negligent Infliction of Emotional Distress ("NIED") (Seventh Claim). The IIED claim is premised upon an incident that took place in the early afternoon of March 11, 2011, when Menchu was walking on the street that passes in front of Legacy Good Samaritan Hospital. He asserts that "all Legacy private security officers" came outside and stood in the entrances of Legacy's two buildings. Complaint, ¶ 24. The officers were dressed similarly to "police in riot gear" and proceeded to assume a "threatening" stance and glare at Menchu. *Id*, ¶ 25. Menchu walked quickly toward a public trolley and bus stop across the street. *Id*, ¶ 26. One of the security guards followed Menchu on the public sidewalk, paused to look at Menchu with a "threatening" glare and then walked away. *Id*. The NIED claim does not relate to a particular event, but generally alleges a failure to train and supervise employees or agents in complying with the civil rights laws. *Id*, ¶¶ 77-78.

An IIED claim requires evidence that:

> (1) the defendant intended to inflict severe emotional distress on the plaintiff, (2) the defendant's acts were the cause of the plaintiff's severe emotional distress, and (3) the defendant's acts constituted an extraordinary transgression of the bounds of socially tolerable conduct.

*Sheets v. Knight*, 308 Or 220, 236, 779, P2d 1000, 1010 (1989).

Determining whether the alleged conduct is an extraordinary transgression of the bounds of socially tolerable conduct is initially a question of law. *Harris v. Pameco Corp.*, 170 Or App 164, 171, 12 P3d 524, 529 (2000). The inquiry, however is "a fact-specific inquiry, one to be made on a case-by-case basis considering the totality of the circumstances. *Delaney v. Clifton*, 180 Or App 119, 130, 41 P3d 1099, 1106 (2002) (citation omitted). Whether the offensiveness of the conduct "exceeds any reasonable limit of social toleration," is "a judgment of social

standards rather than of specific occurrences." *Hall v. May Dept. Stores*, 292 Or 131, 137, 637

P2d 126, 130-31 (1981). Various factors bear upon the offensiveness of the conduct, including

whether a special relationship exists between the defendant and the plaintiff, whether the

defendant had an ulterior purpose, and the setting. *Rosenthal v. Erven*, 172 Or App 20, 23-24, 17

P3d 558, 560 (2001). The relationship between the parties is important because "a defendant's

position or role vis-à-vis a plaintiff may be one that 'imposes on the defendant a greater

obligation to refrain from subjecting the victim to abuse, fright, or shock than would be true in

arm's-length encounters among strangers.'" *Delaney*, 180 Or App at 131, 41 P3d at 1106

(citation and quotation omitted).

Menchu's IIED claim fails on the first and third elements. He has failed to produce any

evidence that any defendant intended to cause him emotional distress. To the contrary, the

evidence shows that the decision-makers were concerned with preventing Menchu from causing

emotional distress to Mitchell after she complained at least four times that Menchu would not

leave her alone. The last step of barring Menchu from Legacy's premises was not outrageous,

but reasonable in order to protect one of Legacy's employees from harassment by a member of

the public.

Menchu also fails to prove the elements of his NIED claim. In the absence of a physical

injury, a claim for NIED "must be grounded in a legal source beyond mere foreseeability" and

requires a special relationship giving rise to a heightened duty of care. *Curtis v. MRI Imaging*

*Servs. II*, 148 Or App 607, 620, 941 P2d 602, 609 (1997) (finding that medical professionals

have no general duty to protect patient against emotional harm), *aff'd*, 327 Or 9, 956 P2d 960

(1998). In other words a plaintiff "must demonstrate that [his] relationship with [defendants]

gave rise to some distinct 'legally protected interest' beyond liability grounded in the general

obligation to 'take reasonable care not to cause a risk of . . . foreseeable . . .  harm' to plaintiff."
*Stevens v. First Interstate Bank of Cal.*, 167 Or App 280, 286-87, 999 P2d 551, 554 (2000)
(citation and quotation omitted).  A plaintiff cannot state a claim for NIED based on an arm's
length relationship, such as a depositor-bank or merchant-customer relationship.  *Id* at 287-88,
999 P2d at 554.  And even if a legally protected interest exists, "the alleged invasion of that
interest must be 'of sufficient importance [as] to warrant the award of damages for emotional
distress.'"  *Collver v. Salem Ins. Agency*, 132 Or App 52, 66, 887 P2d 836, 844 (1994).

Menchu's NIED claim fails because he never had a legally protected interest in his ability
to loiter on Legacy's premises.  He was simply a member of the public.  Therefore, Legacy and
the other defendants were not capable of invading any protected interest of a sufficient quality to
warrant recovery of emotional distress damages.  More importantly, none of the defendants had a
special relationship with Menchu or a specific legal duty to protect him from being barred from
Legacy's premises.  Accordingly, summary judgment should be granted to defendants on the
IIED and NIED claims.

## III.  Sanctions

As a sanction for Menchu's lack of cooperation by disobeying court orders and treating
discovery as a one-way street, defendants also seek dismissal pursuant to FRCP 37(b)(2) and the
court's inherent powers.  In addition, pursuant to FRCP 37(a)(5), Legacy seeks its reasonable
attorney fees incurred in filing a Motion to Compel which the court granted on December 19,
2013, and which Menchu violated on December 30, 2013.

### A.  Dismissal

Since this court recommends granting summary judgment to defendants, it is unnecessary
to consider dismissal of Menchu's claims as a sanction for his conduct.  However, in the event

that this court's recommendation is not adopted, the sanction of dismissal would not be warranted.

If a party fails to obey a court order to provide or permit discovery, "the court where the action is pending may issue further just orders."  FRCP 37(b)(2)(A).  Those orders may include dismissing the action in whole or in part and even rendering a default judgment against the disobedient party.

To determine whether to impose the most severe sanction of dismissal for a party's violation of a court order, the court first weighs five factors:

> (1) the public's interest in expeditious resolution of litigation;
> (2) the court's need to manage its docket; (3) the risk of prejudice
> to the defendants; (4) the public policy favoring the disposition of
> cases on their merits, and (5) the availability of less drastic
> sanctions.

*Malone v. U.S. Postal Serv.*, 833 F2d 128, 130 (9th Cir 1987) (internal quotation marks omitted).

"[W]here a court order is violated, factors 1 and 2 support sanctions and 4 cuts against case-dispositive sanctions, so 3 and 5, prejudice and availability of less drastic sanctions, are decisive."  *Valley Eng'rs Inc. v. Electric Eng'g Co.*, 158 F3d 1051,1057 (9th Cir 1998), citing *Adriana Int'l Corp. v. Thoeren*, 913 F2d 1406, 1412 (9th Cir 1990).

As to the third factor, "[a] defendant suffers prejudice if the plaintiff's actions impair the defendant's ability to go to trial or threaten to interfere with the rightful decision of the case."  *Adriana Int'l Corp.*, 913 F2d at 1412.  "Failure to produce documents as ordered . . . is considered sufficient prejudice."  *Id* (citation omitted).

Analysis for the fifth factor involves three subparts:  "whether the court explicitly discussed alternative sanctions, whether it tried them, and whether it warned the recalcitrant party about the possibility of dismissal."  *Valley Eng'rs, Inc.*, 158 F3d at 1057 (citation omitted).

However, "it is not always necessary for the court to impose less serious sanctions first, or to give an explicit warning." *Id* (citation omitted).

In addition to weighing these five factors, the court "must also determine that the violations of discovery orders were due to the willfulness, bad faith, or fault of the party. Disobedient conduct not shown to be outside the control of the litigant is sufficient to demonstrate willfulness, bad faith, or fault." *Hyde & Drath v. Baker*, 24 F3d 1162, 1167 (9th Cir 1994) (citations omitted).

Applying these principles, dismissal of a § 1983 claim was affirmed when plaintiff "repeatedly failed to file pretrial documents, was unavailable for his deposition and refused to cooperate with the defendants in response to legitimate discovery requests," despite being warned twice by the court that his failure to comply would result in dismissal. *Tuando v. Prosser*, 352 Fed App'x 213, 214 (9th Cir 2009). Similarly, dismissal of a defendant's counterclaims was affirmed when the defendant engaged in "a consistent, intentional, and prejudicial practice of obstructing discovery" by violating repeated court orders, "failing to provide clear answers to interrogatories, giving contradictory responses, making frivolous objections, filing frivolous motions, and failing to provide the information [] sought," despite multiple court warnings and imposition of lesser monetary sanctions. *Computer Task Grp., Inc. v. Brotby*, 364 F3d 1112, 1116 (9th Cir 2004). "These tactics unnecessarily delayed the litigation, burdened the court and prejudiced" the plaintiff. *Id.*

Although Menchu has not been cooperative in the discovery process, his conduct does not rise to the level of obstructive conduct in those cases such that dismissal is warranted. He did file motions to compel (dockets #90) and for a protective order (dockets #103) which this court denied (dockets #96 & #106), but those motions were not frivolous, as contended by

defendants. Instead, they reflected Menchu's misunderstandings about calculating deadlines or the permissible scope of discovery, as is common for self-represented litigants.

Legacy also complains that it was unable to take the deposition of Menchu's wife due to Menchu's lack of cooperation in scheduling it. Legacy fails to acknowledge that it also contributed to the difficulty in coordinating the date and time. Regardless, it is far from evident that defendants have been prejudiced by the lack of that deposition.

Menchu did resist Legacy's requests for production and interrogatories by making frivolous objections, such as the "business privilege," and by refusing to produce responsive documents. As a result, Legacy was forced to file a motion to compel (docket #100), which the court granted in part (docket # 113), ordering that documents and responses be produced by December 30, 2013. Menchu did not produce those documents until two weeks later, but, again, this court fails to see any prejudice to defendant as a result.

Legacy also correctly points out that at his deposition, Menchu also refused to confirm whether he wrote certain emails and refused to answer relevant questions, requiring the court's intervention. However, Legacy has been able to support its motion for summary judgment on its claims without that testimony.

In sum, this court is not persuaded that Legacy has suffered and will continue to suffer prejudice due to Menchu's obstructive tactics. Therefore, sanctioning Menchu by dismissing his claims is not warranted.

**B. <u>Attorney Fees</u>**

Pursuant to FRCP 37(a)(5) and (b)(2)(C), Legacy requests that the court assess monetary sanctions against Menchu for Legacy"s reasonable costs and expenses, including attorney fees, incurred to filed the motion to compel and drafting this motion for sanctions.

FRCP 37(a)(5) awards reasonable expenses incurred, including attorney fees, not only when the court grants a motion to compel, but also if the opposing party provides the requested discovery after the motion to compel is filed. *Lee v. Walters*, 172 FRD 421, 429-30 (D Or 1997), citing *Henry v. Gill Indus., Inc.*, 983 F2d 943, 947 (9th Cir 1993). An award of expenses is mandated unless: "(i) the movant filed the motion before attempting in good faith to obtain the disclosure or discovery without court action; (ii) the nondisclosure, response, or objection was substantially justified; or (iii) other circumstances make an award of expenses unjust." FRCP 37(a)(5).

Menchu did not provide the ordered discovery until two weeks after the deadline of December 30, 2013, explaining that he "was disoriented because of the holy days." Although this excuse is not "substantially justified," he also points out the lack of prejudice to Legacy since its attorney advised the court that he would be on vacation from December 23, 2013, through January 10, 2014. In any event, this court granted defendants additional time to file their summary judgment motion. Under these circumstances, Menchu's belated compliance does not justify an award of expenses to defendants.

## **RECOMMENDATIONS**

For the reasons set forth above, Defendants' Motion for Summary Judgment and Sanctions (docket #124) should be GRANTED as to summary judgment and DENIED as to sanctions, Menchu's Cross-Motion for Summary Judgment (docket #139) should be DENIED, and this court should enter a judgment in favor of defendants.

///

///

///

## SCHEDULING ORDER

The Findings and Recommendation will be referred to a district judge.  Objections, if any, are due Friday, May 30, 2014.  If no objections are filed, then the Findings and Recommendation will go under advisement on that date.

If objections are filed, then a response is due within 14 days after being served with a copy of the objections.  When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

## NOTICE

This Findings and Recommendation is not an order that is immediately appealable to the Ninth Circuit Court of Appeals.  Any Notice of Appeal pursuant to Rule 4(a)(1), Federal Rules of Appellate Procedure, should not be filed until entry of a judgment.

DATED  May 13, 2014.

s/ Janice M. Stewart
Janice M. Stewart
United States Magistrate Judge